# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 9, 2025        Decided March 31, 2026

No. 24-1298

WORLD SHIPPING COUNCIL,
PETITIONER

v.

FEDERAL MARITIME COMMISSION AND UNITED STATES OF
AMERICA,
RESPONDENTS

———

On Petition for Review of a Final Order
of the Federal Maritime Commission

———

*Robert K. Magovern* argued the cause for petitioner. With him on the briefs were *Matthew Howell* and *Rachel Schwartz*.

*Harry J. Summers*, Attorney-Advisor, Federal Maritime Commission, argued the cause for respondents. With him on the brief were *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, and *Phillip "Chris" Hughey*, General Counsel, Federal Maritime Commission. *Tamar Anolic* and *Courtney E. Mallon*, Attorneys, Federal Maritime Commission, entered appearances.

Before: SRINIVASAN, *Chief Judge*, WALKER, *Circuit Judge*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: The Shipping Act of 1984, 46 U.S.C. § 40101 *et seq.*, prohibits common carriers from unreasonably refusing to deal or to negotiate with a would-be shipper. 46 U.S.C. § 41104(a)(10). In 2022, the Congress directed the Federal Maritime Commission to define an unreasonable refusal to deal or to negotiate with respect to vessel space. Two years later, the Commission issued a rule implementing that statutory directive with respect to ocean common carriers. Definition of Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Common Carrier (Final Rule), 89 Fed. Reg. 59648 (2024) (codified at 46 C.F.R. § 542.1).

The World Shipping Council, a trade association representing approximately 90% of the world's liner or regularly scheduled, fixed-route shipping vessel services, now petitions for review of the Final Rule. It argues that the rule exceeds the Commission's statutory authority and that it is arbitrary and capricious. We disagree on both counts and so deny the Council's petition.

## I. Background

The 1984 Act provides a "regulatory process for the common carriage of goods by water in the foreign commerce of the United States." 46 U.S.C. § 40101(1). Although the Congress first comprehensively regulated the shipping industry with the Shipping Act of 1916, Pub. L. No. 64-260, 39 Stat. 728, the 1984 Act largely created the modern regime, in which the Congress sought to regulate "with a minimum of government intervention and regulatory costs." 1984 Act, Pub. L. No. 98-237, § 2, 98 Stat. 67, 67 (codified as amended at 46

U.S.C. § 40101). To that end, the 1984 Act implemented various deregulatory reforms, such as the authorization of service contracts, which provide a privately negotiated alternative to the publication of a tariff approved by the FMC. *Id.* § 8(c), 98 Stat. at 75 (codified as amended at 46 U.S.C. § 40502); *see also FMC History, The Shipping Act of 1984*, Fed. Mar. Comm'n, https://perma.cc/VH5C-R9EB (last visited Mar. 10, 2026) ("The pricing of liner services via negotiated contracts, rather than exclusively by public tariffs, was a change that had profound effects on the liner industry"). The 1984 Act, together with the ICC Termination Act of 1995, also eliminated the Commission's general ratemaking authority over common carriers under §§ 17 and 18 of the 1916 Act. *See* 1984 Act § 20(b)(8), 98 Stat. at 89 (repealing the ratemaking provision of § 17); ICC Termination Act of 1995, Pub. L. No. 104-88, § 335(b)(6), 109 Stat. 803, 953–54 (repealing § 18).

The Congress most recently amended the 1984 Act by means of the Ocean Shipping Reform Act of 2022 (OSRA). Pub. L. No. 117-146, 136 Stat. 1272. In the preamble of the implementing rule here under review, the Commission concluded that "[o]ne basis, but not the only one, for some of the OSRA 2022 provisions were the challenges expressed by U.S. exporters trying to obtain vessel space to ship their products." 89 Fed. Reg. at 59649/3.

## A. Statutory Framework

The Shipping Act regulates, among other entities, common carriers. A common carrier, with certain exceptions not relevant here, "holds itself out to the general public to provide transportation by water of . . . cargo between the United States and a foreign country for compensation"; "assumes responsibility for the transportation from the port or point of receipt to the port or point of destination"; and "uses, for all or

part of that transportation, a vessel operating on the high seas or the Great Lakes." 46 U.S.C. § 40102(7)(A). If a common carrier operates "the vessels by which the ocean transportation is provided," then it is an ocean common carrier. *See id.* § 40102(17)–(18).

Section 41104(a)(10), as amended by OSRA § 7(a)(1)(D), prohibits common carriers from, among other things, "unreasonably refus[ing] to deal or negotiate . . . with respect to vessel space accommodations provided by an ocean common carrier." 46 U.S.C. § 41104(a)(10); *see also* OSRA § 7(a)(1)(D), 136 Stat. at 1274. OSRA § 7(d) further instructed the Commission to issue a rule defining such unreasonable refusals. OSRA § 7(d), 136 Stat. at 1276 (codified at 46 U.S.C. § 41104 note).

## B. The Final Rule

Pursuant to the OSRA § 7(d) directive, the Commission issued a Notice of Proposed Rulemaking defining when an ocean common carrier unreasonably refuses to deal or to negotiate with respect to vessel space accommodations. 87 Fed. Reg. 57674 (2022). The Commission there took the uncontroversial position that the prohibited conduct "does not lend itself to a general definition and instead must be evaluated on a case-by-case basis." *Id.* at 57676/2. The proposed rule therefore listed several mandatory but non-exhaustive factors the Commission would consider in evaluating the reasonableness of a particular refusal. *Id.* at 57678/3–79/1. One consideration was whether an ocean carrier "made business decisions that were subsequently applied in a fair and consistent manner." *Id.* at 57679/1. The Commission explained it had "previously found reasonable those decisions that are connected to a legitimate business decision or motivated by legitimate transportation factors." *Id.* at 57676/3.

In response to comments, the Commission issued a Supplemental Notice of Proposed Rulemaking (SNPRM) that made four principal changes relevant here. First, instead of a non-exhaustive list of mandatory factors that the Commission would consider in evaluating reasonableness, the Commission provided a list of non-binding "factors that the Commission may choose to consider in evaluating whether a particular ocean common carrier's conduct was unreasonable." 88 Fed. Reg. 38789, 38804/2 (2023); *see also id.* at 38807/2–3. Second, the Commission removed any mention of "business decisions" from that list. *See id.* at 38807/2–3. Third, the Commission included a few "[n]on-binding examples of unreasonable conduct." *Id.* at 38807/3. Fourth, the Commission added a definition of an unreasonable refusal to provide cargo space accommodations when available, which is a distinct prohibition in 46 U.S.C. § 41104(a)(3). 88 Fed. Reg. at 38807/1–2; *see also id.* at 38791/2–92/3; OSRA § 7(a)(1)(B), 136 Stat. at 1274 (codified at 46 U.S.C. § 41104(a)(3)).

After another comment period, the Commission published the Final Rule on July 23, 2024. Although the prohibition in 46 U.S.C. § 41104(a)(10) covers all unreasonable refusals to deal or to negotiate by a common carrier, the definition in the Final Rule applies only to containerized cargo on ocean (or "vessel-operating") common carriers. 89 Fed. Reg. at 59649/2. As had the SNPRM, the Final Rule also defined an unreasonable refusal of cargo space accommodations when available. 46 C.F.R. § 542.1(c)–(e).

The Final Rule identifies the following non-binding factors the Commission may consider "[i]n evaluating the reasonableness of an ocean common carrier's refusal to deal or negotiate with respect to vessel space accommodations":

(1)    Whether the ocean common carrier followed a documented export policy that enables the timely and efficient movement of export cargo;

(2)    Whether the ocean common carrier engaged in good faith negotiations;

(3)    Whether the refusal was based on legitimate transportation factors; and

(4)    Any other relevant factors or conduct.

*Id.* § 542.1(g); *see also id.* § 542.1(d) (listing nearly identical factors for "evaluating the reasonableness of an ocean common carrier's refusal to provide cargo space accommodations"). The Commission defines a documented export policy as a "written report produced by an ocean common carrier that details the ocean common carrier's practices and procedures for U.S. outbound services." *Id.* § 542.1(b). An "ocean common carrier must submit a documented export policy to the Commission once per calendar year and include . . . pricing strategies, services offered, strategies for equipment provision, and descriptions of markets served." *Id.* § 542.1(j)(1).

The Final Rule also retained non-binding examples of activity the Commission deemed proscribed by 46 U.S.C. § 41104(a)(10). The example to which the Council objects is "[q]uoting rates that are so far above current market rates they cannot be considered a good faith offer or an attempt at engaging in good faith negotiations." 46 C.F.R. § 542.1(h)(1).

## II.  Jurisdiction

This court has jurisdiction of the Council's petition to review the Final Rule pursuant to 28 U.S.C. § 2342(3)(B).

Although the Commission previously moved to dismiss this case for lack of standing, it no longer contests the Council's standing. Indeed, because the Council's members are "the object of the action," its associational standing is "self-evident." *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592 (D.C. Cir. 2023) (cleaned up). Further, the Council provided sworn declarations from two members indicating that the Final Rule has imposed concrete costs and burdens on them. We need not inquire further. *See World Shipping Council v. FMC*, 152 F.4th 215, 221 (D.C. Cir. 2025).

### III. Analysis

The Council argues that the definition of an unreasonable refusal to deal or to negotiate with respect to vessel space accommodations in the Final Rule violates the Administrative Procedure Act, 5 U.S.C. § 706, in three respects. First, the Council claims the Commission does not have statutory authority to consider the price in evaluating the reasonableness of a carrier's offer and that the Commission did not set forth a sound basis for doing so. Second, the Council claims that requiring a carrier to submit a documented export policy exceeds the Commission's statutory authority, is arbitrary and capricious, and conflicts with another provision in the 1984 Act. Finally, the Council argues the Commission's removal of business decisions from the list of factors that may be considered in evaluating reasonableness is arbitrary and capricious. Because the definition of an unreasonable refusal to provide cargo space accommodations when available in the Final Rule also includes consideration of a documented export policy and omits any mention of business decisions, *see* 46 C.F.R. § 542.1(d), the Council's second and third challenges apply to both definitions.

"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). In some situations, "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion. . . . For example, some statutes expressly delegate to an agency the authority to give meaning to a particular statutory term." *Id.* at 394 (cleaned up). In that case, the "role of the reviewing court" is "to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 395. We must "police the outer statutory boundaries of those delegations" and "ensure that agencies exercise their discretion consistent with the APA." *Id.* at 404.

Arbitrary and capricious review is narrow in scope. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The standard "requires that agency action simply be reasonable and reasonably explained." *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014) (cleaned up). *State Farm* further provides:

> [A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

463 U.S. at 43.

## A. Quoting Rates That Are "So Far Above Current Market Rates"

The Council contends the Commission has no statutory authority to consider price in evaluating whether an ocean common carrier has acted unreasonably, and the Commission inadequately explained the role of price in the Final Rule. The rule implicates price as a non-binding example of unreasonable conduct, to wit: "Quoting rates that are so far above current market rates they cannot be considered a good faith offer or an attempt at engaging in good faith negotiations." 46 C.F.R. § 542.1(h)(1). The Council argues the "act of claiming that a rate is unreasonably high or low is tantamount to setting an upper or lower rate limit, thus regulating the rate," which the Commission has no statutory authority to do. Moreover, per the Council, there is no precedent for an agency lacking ratemaking authority to consider rates in a reasonableness determination.

The Commission counters that there is a "difference between (1) setting shipping rates and (2) occasionally evaluating whether one particular rate quoted by a carrier in a specific context was unreasonably high, as just one potentially relevant factor, and solely as part of an adjudication." We agree.

Like the Commission, we do not view the example in 46 C.F.R. § 542.1(h)(1) as tantamount to rate regulation because, in any adjudication of an alleged violation of the Final Rule, the Commission must also consider other relevant factors. Failure to do so would be arbitrary and capricious. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Contrary to the Council's assertion that "nothing in the Final Rule would prevent the Commission from *only* considering price factors in any given case," this court recently held that it violates the APA

for "the FMC to commit to making a circumstantial, fact-bound inquiry . . . and then, when it [comes] time to apply the rule, to jettison all but its favorite factor." *Evergreen Shipping Agency (Am.) Corp. v. FMC*, 106 F.4th 1113, 1118 (2024). Put otherwise, if a common carrier can explain why its quoted prices, though dramatically higher than the market rate, are nonetheless reasonable, then the Commission must duly consider that explanation.

Moreover, we are skeptical of the Council's broad assertion that "[t]here is no scenario under which an agency that does not have ratemaking authority can permissibly use rate levels as a measure to evaluate reasonableness." The National Labor Relations Act, which contains no grant of power to set wages, imposes a duty to bargain in good faith. 29 U.S.C. § 158(d). In practice, the affirmative duty to bargain in good faith resembles the prohibition on unreasonable refusals to deal or to negotiate. And we have held, with respect to the NLRA, that "[i]n determining whether [a party] fulfilled this obligation [of good-faith bargaining], the terms of its bargaining proposals may be examined." *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1188 (D.C. Cir. 1981); *see also K-Mart Corp. v. NLRB*, 626 F.2d 704, 707 (9th Cir. 1980) ("We agree with the ALJ's characterization of the wage proposals as 'meager.' In an age of double digit inflation, an offer of little or no wage increase is an effort to decrease wages. The ALJ could infer that the company was not bargaining seriously"). That the National Labor Relations Board may consider an employer's wage proposal in assessing good-faith bargaining suggests the Commission need not have ratemaking authority to consider a carrier's rate proposal in assessing whether the carrier unreasonably refused to deal or to negotiate with respect to vessel space accommodations.

To be sure, an unreasonably low wage offer alone is rarely, if ever, the only evidence supporting a violation of the duty to bargain in good faith under the NLRA. That is because the NLRB considers the "totality of the employer's conduct," *see, e.g.*, *District Hosp. Partners, L.P. v. NLRB*, 141 F.4th 1279, 1290 (D.C. Cir. 2025), and therefore must consider all relevant circumstances. The preamble of the rule here under review similarly commits the Commission to "look at the totality of circumstances relevant to each case to determine whether or not an ocean common carrier has acted unreasonably." 89 Fed. Reg. at 59657/3. That other factors are usually relevant, however, does not foreclose the possibility of a proposal so extreme that it "cannot be considered a good faith offer or an attempt at engaging in good faith negotiations." 46 C.F.R. § 542.1(h)(1).

In the presumably rare event that a carrier quotes an extreme rate that it cannot justify, we conclude the FMC has the authority to decide the carrier has "unreasonably refuse[d] to deal or negotiate" with its counterparty. 46 U.S.C. § 41104(a)(10). As the Council conceded at oral argument, there is no practical difference between quoting a rate of one billion dollars and outright refusing to deal. *See* Oral Arg. Tr. 19:12–17. To hold otherwise would permit any ocean carrier to refuse to deal or to negotiate with impunity, simply by quoting an unrealistically high rate. In the Commission's words: The "Congress did not pass such a self-defeating law." Indeed, we recognize an interpretive presumption against ineffective readings of a statute that would "render the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner." *Garland v. Cargill*, 602 U.S. 406, 427 (2024) (cleaned up) (quoting *The Emily*, 22 U.S. (9 Wheat.) 381, 389 (1824)). Although a presumption cannot justify a deviation from the plain meaning of a statute, *see id.* at 427–28, invoking the presumption is particularly appropriate

here because the Congress has instructed the Commission specifically to issue a rule "defining [an] unreasonable refusal to deal or negotiate with respect to vessel space," OSRA § 7(d), 136 Stat. at 1276 (codified at 46 U.S.C. § 41104 note), and the "Congress presumably does not enact useless laws." *United States v. Castleman*, 572 U.S. 157, 178 (2014) (Scalia, J., concurring in part and concurring in the judgment).

Having determined the Commission has authority to consider price in the manner contemplated by 46 C.F.R. § 542.1(h)(1), we next address the Council's contention that the Commission acted arbitrarily and capriciously by failing to explain the contours of that provision. Specifically, the Council argues the term "so far above current market rates" is impermissibly vague. It was not arbitrary, however, for the Commission to "decline[] to set a bright line to determine how far above the market rate is unreasonable." 89 Fed. Reg. at 59662/2. This court has repeatedly upheld agency action that did not provide a "clear line of demarcation to define an open-ended term, instead choosing to establish the term's contours through a series of adjudications." *PDK Lab'ys Inc. v. DEA*, 438 F.3d 1184, 1195 (2006) (cleaned up).

Nor did the agency, in promulgating a general rule, need to specify exactly what data or methodology it would rely upon to estimate market rates or, more likely, the high end of a range of market rates. *Cf. Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 870 (D.C. Cir. 1996) ("[F]ailure of an agency to identify every detail of a process before it is used does not automatically require judicial interference in matters that must be thought to lie within the agency's expertise"). If the Commission ultimately uses an unreliable or inconsistent methodology to estimate market rates, then a common carrier may seek review of that specific application of the Final Rule. That the Council can "point to a hypothetical case in which the rule might lead

to an arbitrary result does not render the rule arbitrary or capricious." *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619 (1991) (cleaned up).

In any event, as counsel for the Commission pointed out at oral argument, the statutory remedy for a violation of 46 U.S.C. § 41104(a)(10) is reparations. 46 U.S.C. §§ 41301(a), 41305(b). Because awarding reparations requires a benchmark, such as a market rate, we presume the Commission has the institutional ability reliably to assess a complainant's evidence of market rates. *See, e.g.*, *OJ Com., LLC v. Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG*, Docket No. 21-11, 2024 WL 4034610, at *29 (F.M.C. Aug. 27, 2024) (assessing data in the record to identify the most supportable measure of the market price of a proposed service contract after holding a party unreasonably refused to negotiate).

## B. Documented Export Policy

The Council next argues that requiring an ocean carrier to have a "documented export policy," 46 C.F.R. § 542.1(j), a departure from which may be considered in evaluating a refusal to provide cargo or vessel space accommodations, 46 C.F.R. § 542.1(d)(1), (g)(1), exceeds the Commission's authority and is arbitrary and capricious. The Commission claims authority in 46 U.S.C. § 40104(a)(1), which authorizes it to "require a common carrier . . . to file with [it] a periodical or special report, an account, record, rate, or charge, or a memorandum of facts and transactions related to the business of the common carrier." The Final Rule defines a documented export policy broadly as a "written report . . . that details the ocean common carrier's practices and procedures for U.S. outbound services." 46 C.F.R. § 542.1(b); *see also* 89 Fed. Reg. at 59663/3 ("An ocean common carrier's general policies concerning their

export operations are facts related to the business of the common carrier"). Even so, the Council argues that 46 U.S.C. § 40104(a)(1) authorizes the Commission to collect only "information or an accounting of events that have already taken place," and not what it characterizes as "inherently prospective" information, such as the "pricing strategies, services offered, strategies for equipment provision, and descriptions of markets served" required by the Final Rule. 46 C.F.R. § 542.1(j)(1).

Section 40104(a)(1) is not so narrow. The "pricing strategies," etc. of a common carrier at any given time are facts "related to the business of [a] common carrier" at that time, not just prospectively. 46 C.F.R. § 542.1(j); 46 U.S.C. § 40104(a)(1). The ordinary meaning of "report" is capacious enough to encompass the requested information. The Council's preferred dictionary definition is "a formal oral or written presentation of the results of an investigation, research assignment, etc., often with a recommendation for action." Black's Law Dictionary (12th ed. 2024). It is difficult to see why a definition that includes "often with a recommendation for action" categorically excludes even truly prospective information. Another definition that is closer to contemporaneous with the 1984 Act is even broader. *Report*, Black's Law Dictionary (5th ed. 1979) ("An official or formal statement of facts or proceedings. To give an account of, to relate, to tell, to convey or disseminate information"). We conclude that the Commission is authorized by 46 U.S.C. § 40104(a)(1) to require an ocean common carrier to submit a documented export policy.

The Council's contention that the requirement of a documented export policy is arbitrary and capricious fares no better. The Commission explained that the "information provided [in a documented export policy] will help the

Commission determine whether an ocean common carrier's conduct in a specific matter aligns with [its] general policies and whether the ocean common carrier thus acted reasonably." 89 Fed. Reg. at 59663/3; *see also* 46 C.F.R. § 542.1(d)(1), (g)(1). Because we agree that departing from common practices and procedures can be evidence of unreasonableness, we think the Commission's justification for requiring a carrier to submit a documented export policy is reasonable and reasonably explained.

For the same reason, contrary to the Council, we think the scope of the documented export policy is properly limited "to fulfill the objective of the order." 46 U.S.C. § 40104(a)(3)(A). Furthermore, we find the specific requirements of the documented export policy, such as descriptions of pricing strategies or markets served, are "sufficiently comprehensible to the regulated class" to deny a "pre-enforcement APA challenge on vagueness grounds." *All. for Nat. Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 134 (D.D.C. 2011).

Finally, the Council argues that, because the Commission lacks the power to regulate rates, the Commission has no authority to consider any deviation from the pricing strategies detailed in a carrier's documented export policy. This argument fails because we have already concluded that the Commission is not categorically barred from considering prices in order to determine whether a refusal to deal or to negotiate with respect to vessel space accommodations is unreasonable.

## C. Business Decisions

Lastly, the Council argues that the Commission arbitrarily and capriciously removed any mention of business decisions from the Final Rule, s*ee* 46 C.F.R. § 542.1(d), (g), improperly departing from both the proposed rule and agency precedent. The preamble of the Final Rule makes clear, however, that

"information on business decisions relevant to establishing a reasonable refusal to deal would still be relevant to the Commission's analysis." 89 Fed. Reg. at 59657/3; *see also id.* at 59662/1. At oral argument, counsel for the Commission acknowledged that the Commission may not decline to consider a relevant business decision because failure to consider a relevant factor would itself be arbitrary. *See* Oral Arg. Tr. 38:16–24. In short, the Commission did not meaningfully change course by dropping its main reference to business decisions. Nor did the Commission free itself to ignore its precedents regarding business decisions insofar as those precedents are relevant to issues arising under the Final Rule.

## IV.  Conclusion

For the foregoing reasons, the Council's petition for review is

*Denied.*